**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CAPSONIC AUTOMOTIVE, INC., | ) | |
| an Illinois corporation, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.    14 CV 7933 |
| | ) | |
| v. | ) | |
| | ) | |
| METAL KRAFT INDUSTRIES, INC., | ) | |
| a Pennsylvania corporation, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiff Capsonic Automotive, Inc. ("Plaintiff") complains against Defendant Metal

Kraft Industries, Inc. ("Defendant") as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff is an Illinois corporation with its principal place of business located at

460 South Second Street, Elgin, Illinois 60123.

2.      Defendant is a Pennsylvania corporation with its principal place of business

located at 1944 Shumway Hill Road, Wellsboro, Pennsylvania 16901.

3.      Plaintiff is not a citizen of Pennsylvania and Defendant is not a citizen of Illinois.

4.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1332(a)(1) as Plaintiff and Defendant are citizens of different states and the amount in

controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.      This Court has personal jurisdiction over Defendant because Defendant does

business in Illinois, the contract at issue in this matter is substantially connected to Illinois, and

the contract at issue in this matter provides that any litigation regarding the contract shall be brought in Illinois.

6.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claims herein occurred in this district and the contract at issue provides that this is a proper venue for any litigation regarding the contract.

## BACKGROUND

### Introduction

7.      Founded in 1996, Plaintiff is a veteran-owned, certified producer of a wide variety of electrical, mechanical, and lighting products for the automotive and aerospace industries.  All of Plaintiff's automotive products must meet stringent automotive industry technical standards and specifications.  Plaintiff's customers include, *inter alia*, Ford Motor Company, General Motors, Chrysler Corporation, Bosch, Siemens, and Freightliner.

8.      On or about June 27, 2008, Plaintiff and its customer Nexteer Automotive Corporation ("Nexteer"), through Nexteer's predecessor in interest, entered into a purchase order for Plaintiff to provide a brake transmission shift interlock (BTSI) solenoid component (the "Solenoid") to Nexteer, which Nexteer would then incorporate into steering column assemblies for Ford vehicles (the "Steering Column").  The Solenoid is an important safety feature for a vehicle because it keeps the driver from shifting out of "park" unless the brake is applied and prevents the key from being removed from the ignition unless the transmission is in the "park" position.  Importantly, this safety feature is required for many vehicles to meet Federal Motor Vehicle Safety Standards and Regulations promulgated by the United States Department of Transportation, National Highway Safety Administration ("FMVSS").

2

9.      In the fall of 2010, Plaintiff and Defendant entered into negotiations for Defendant to provide a certain flux collector product to Plaintiff within certain technical specifications, which Plaintiff would then incorporate into the Solenoid (the "Products").  At this time, Defendant represented to Plaintiff that it could provide an adequate weekly supply of the Products to Plaintiff (approximately 25,000 pieces of the Product/week) and that each unit of the Product could be incorporated into the Solenoid and ultimately the Steering Column and would: (a) be free from defects in material, workmanship and design; (b) conform to applicable drawings, designs, quality control plans, specifications and samples and other descriptions furnished or specified by Plaintiff; (c) be merchantable; (d) be fit for the intended purpose and operate as intended; and (e) comply with all applicable national and local laws.

10.      Based on Defendant's representations, Plaintiff and Defendant agreed to have Defendant provide the Products for a price of $.152/unit for approximately 15,000-25,000 items/week to be made available for transportation by Plaintiff's carriers to Plaintiff's El Paso, TX Warehouse facility, and for the agreement to be subject to Plaintiff's terms and conditions for all of its purchase orders and Plaintiff's supplier's manual (as customary in the industry), which were explicitly disclosed to Defendant (the "Agreement").  The Agreement was to be memorialized in blanket purchase orders for the Products as customary in the industry.

11.      Based on the parties' Agreement and Defendant's representations, Plaintiff placed a blanket purchase order for the Products on November 24, 2010, which was explicitly subject to Plaintiff's terms and conditions and supplier's manual for the purchase order (the "Original Purchase Order").  True and accurate copies of the Original Purchase Order and Plaintiff's terms

and conditions and supplier's manual for the Original Purchase Order are attached hereto as Exhibit 1.

12.     Upon Defendant's receipt of the Original Purchase Order, Defendant contacted Plaintiff and confirmed that all of the terms set forth in the Original Purchase Order were correct.

13.     On November 29, 2010, Plaintiff received its first shipment of the Products pursuant to the Original Purchase Order.  To the best of Plaintiff's knowledge, the first shipment did not contain any defective Products.

14.     The Original Purchase Order was subsequently revised on May 24, 2011 and June 23, 2011, which revisions were also explicitly subject to Plaintiff's terms and conditions and supplier's manual pursuant to the Agreement (the "Revised Purchase Orders").  True and accurate copies of the Revised Purchase Orders and the terms and conditions and supplier's manual for the Revised Purchase Orders are attached hereto as Exhibit 2.

15.     Upon Defendant's receipt of the Revised Purchase Orders, Defendant contacted Plaintiff and confirmed that all of the terms set forth in the Revised Purchase Orders were correct.

16.     Pursuant to the Revised Purchase Orders, Plaintiff received the Products during the summer of 2011 and paid for the Products in the agreed-upon amount.

17.     Plaintiff incorporated the Products into its Solenoid components and shipped the Solenoid components to Nexteer for integration into the Steering Columns.  Nexteer subsequently shipped the Steering Columns to Ford through the Ford-specified value stream for assembly into Ford trucks.

4

**The Products Prove to be Defective**

18. On or about September 2011, Ford tested certain 2011 model year F-150 trucks and 2012 model year F-250, F-350, F-450, and F-550 trucks. These trucks had the Steering Column from Nexteer and contained the Solenoid from Plaintiff. The Solenoid from Plaintiff contained the Products from Defendant.

19. Ford involved Nexteer in the evaluation of Steering Columns from the vehicles that failed the tests. Subsequent specific tests revealed that the Solenoid did not work correctly. Specifically, Ford's tests revealed that the tested Solenoids exhibited symptoms causing a certain plunger shaft in the BTSI to bind and not function properly. As a result, the Solenoid did not prevent a vehicle from being shifted out of "park" without depressing the brake pedal.

20. Upon Ford's discovery, Ford immediately notified Nexteer of the defect, Nexteer immediately notified Plaintiff of the defect, and Plaintiff immediately notified Defendant of the defect. The parties then began identification and containment activities to identify the problem and vehicles potentially affected and to contain the defective vehicles.

21. Further testing and investigation by Ford, Nexteer, Plaintiff, and Defendant revealed that the source of the Solenoid dysfunction was contamination on the inner diameter surface of the Flux Collector component produced by Defendant and that the root cause was a certain failure occurring at St. Marys Metal Finishing ("St Marys"), Defendant's metal plating vendor for the Products.

22. Through their investigation, Ford, Nexteer, Plaintiff, Defendant and St Marys discovered that a tank used at the St Marys plating facility was not free of foreign substances during the plating process for the Products. As a result, many of the Products shipped to Plaintiff

under the Revised Purchase Orders exhibited an unacceptably high amount of localized surface

contamination (which was entirely inappropriate for the composition of the part), causing a

defect in the inner diameter of some of the Products and, ultimately, the functional problem with

the Solenoid.

23.     While Plaintiff applied automotive industry- accepted inspection processes

pursuant to its internal-documented procedures to the Products before integrating them into the

Solenoid, the defect in the Products was not detected because the latent defect could not be

discovered by an unaided visual inspection or a simple examination of the Products.  Neither

Plaintiff nor Defendant had cause to anticipate that any amount of contamination for the Products

was a possibility.

24.     To ensure that it did not plate any more defective Products, St Marys implemented

a process to more thoroughly clean its tanks beginning in September 2011.

**Ford Recalls Approximately 16,091 Potentially Affected Trucks**

25.     During its investigation, Ford determined that it had already shipped/delivered

approximately 16,091 trucks to customers/dealerships that potentially included the defective

Products in the Steering Column before it discovered the defect during its testing.  The identified

trucks contained the Products that came from the same batch of Products from Defendant as the

defective Products.

26.     On December 5, 2011, Ford issued a voluntary compliance recall of

approximately 16,091 potentially affected trucks with the Products because the defect in the

Products was a safety concern and also caused the affected vehicles to not be in compliance with

the FMVSS.  A true and accurate copy of the recall notice is attached hereto as Exhibit 3.

6

27.     On or about December 2011, Nexteer notified Plaintiff of Ford's deliberations regarding a potential Recall, and Plaintiff communicated to Defendant the potential for upstream liability to Plaintiff/Defendant, potentially including a Ford decision to issue a recall.

28.     As the supplier of the Solenoid (with the Products), Plaintiff incurred all the costs and damages associated with the original identification and containment activities at all value stream locations, including Ford and Nexteer facilities, and in addition the costs and damages associated with the recall suffered by Ford/Nexteer.   On May 22, 2014, Plaintiff reached an agreement with Nexteer regarding compensation to Nexteer for the use of the Solenoids with the defective Products.  The agreement calls for compensation to Nexteer well in excess of $75,000, exclusive of interest and costs.

29.     As the immediate supplier of the Products to Plaintiff, Defendant is now liable to Plaintiff for any and all costs and damages and is required to indemnify Plaintiff for any damages resulting from the defective Products recoverable under the Agreement, the Revised Purchase Orders, the Uniform Commercial Code, and any and all amounts Plaintiff had to pay to Nexteer.

30.     On August 26, 2014, Plaintiff requested that Defendant compensate and indemnify it for the principal amount of loss for compensation to Nexteer stemming from the recall.  A true and accurate copy of Plaintiff's notice to Defendant is attached hereto as Exhibit 4.

31.     Defendant refused to compensate and indemnify Plaintiff for its losses.

32.     On or about October 1, 2014, Defendant ceased performing under the then-current purchase order in effect for the Products.

## COUNT I
## BREACH OF CONTRACT

33.     Plaintiff incorporates by reference paragraphs 1-32 of its Complaint as if fully set forth herein as paragraph 33.

34.     The Agreement is a valid and enforceable contract.

35.      Plaintiff has performed any and all conditions and obligations required of it pursuant to the Agreement.

36.     Defendant breached the Agreement by, *inter alia*, failing to indemnify Plaintiff for any and all losses caused by the Ford recall, by providing the non-conforming Products, and ceasing to perform under the Revised Purchase Orders prior to the expiration of the Revised Purchase Orders.

37.      As a direct result of Defendant's various breaches of the Agreement, Plaintiff has been damaged and continues to be damaged in an amount to be determined at trial in an amount in excess of $1,500,000.00, plus all costs, attorneys' fees and other costs/expenses/damages incurred in enforcing the Agreement and recoverable under the applicable terms and conditions and supplier's manual.

WHEREFORE Plaintiff Capsonic Automotive, Inc. prays for the entry of a judgment in its favor and against Defendant Metal Kraft Industries, Inc. in an amount to be determined at trial believed to be in excess of $1,500,000.00, plus attorney's fees, costs of suit, and any other such further relief as this Honorable Court deems just and appropriate.

## COUNT II
## BREACH OF EXPRESS WARRANTIES

8

38.     Plaintiff incorporates by reference paragraphs 1-37 of its Complaint as if fully set forth herein as paragraph 38.

39.     As previously set forth in the Agreement, the Original Purchase Order, and pursuant to Section 21 of the terms and conditions for the Revised Purchase Orders (the purchase orders whereby Defendant provided the defective Products), Defendant warranted to Plaintiff that the Products would: (a) be free from defects in material, workmanship and design; (b) conform to applicable drawings, designs, quality control plans, specifications and samples and other descriptions furnished or specified by Plaintiff; (c) be merchantable; (d) be fit for the intended purpose and operate as intended; and (e) comply with all applicable national and local laws (collectively the "Express Warranties").

40.     The Express Warranties are an affirmation of fact and/or a promise to Plaintiff relating to the Products.

41.     The Express Warranties became part of the basis of the bargain between Plaintiff and Defendant.

42.     The Express Warranties are a guarantee by Defendant that the Products will conform to the affirmation/promise.

43.     Plaintiff reasonably relied on the Express Warranties in placing the Revised Purchase Orders with Defendant.

44.     Defendant breached the Express Warranties because the Products were not: (a) free from defects in material, workmanship and design; (b) in conformance to applicable drawings, designs, quality control plans, specifications and samples and other descriptions

furnished or specified by Plaintiff; (c) merchantable; (d) fit for the intended purpose and did not

operate as intended; and (e) in compliance with all applicable national and local laws.

45.     As a direct result of Defendant's breach of the Express Warranties, Plaintiff has

been damaged and continues to be damaged in an amount to be determined at trial in an amount

in excess of $1,500,000, plus all costs, attorneys' fees and other expenses/damages incurred.

WHEREFORE Plaintiff Capsonic Automotive, Inc. prays for the entry of a judgment in

its favor and against Defendant Metal Kraft Industries, Inc. in an amount to be determined at trial

believed to be in excess of $1,500,000.00, plus attorney's fees, costs of suit, and any other such

further relief as this Honorable Court deems just and appropriate.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (810 ILCS 5/2-314)

46.     Plaintiff incorporates by reference paragraphs 1-45 of its Complaint as if fully set

forth herein as paragraph 46.

47.     Plaintiff's purchase of the Products was the sale of goods.

48.     Defendant, as the seller of the goods, is a merchant with respect to the Products.

49.     The Products were not of merchantable quality at the time of sale because they

were defective and not in compliance with FMVSS and therefore they were unfit for the ordinary

purpose for which they are used in the Solenoid and Steering Column.

50.     Plaintiff timely notified Defendant of the defects and the recall.  In fact,

Defendant assisted in the investigation of the defect in the Products.

51.     As a direct result of Defendant's breach of the implied warranty of

merchantability, Plaintiff has been damaged and continues to be damaged in an amount to be

determined at trial in an amount in excess of $1,500,000, plus all costs, attorneys' fees and other expenses/damages incurred.

WHEREFORE Plaintiff Capsonic Automotive, Inc. prays for the entry of a judgment in its favor and against Defendant Metal Kraft Industries, Inc. in an amount to be determined at trial believed to be in excess of $1,500,000.00, plus attorney's fees, costs of suit, and any other such further relief as this Honorable Court deems just and appropriate.

## COUNT IV
## BREACH OF IMPLIED WARRANTY OF FITNESS
## FOR A PARTICULAR PURPOSE (810 ILCS 5/2-315)

52.     Plaintiff incorporates by reference paragraphs 1-51 of its Complaint as if fully set forth herein as paragraph 52.

53.     When the Agreement was formed and when Defendant supplied the Products under the Revised Purchase Orders, Defendant knew that the Products were required for the particular purpose of integration into the Solenoid and Steering Column in compliance with FMVSS.

54.     Plaintiff relied on Defendant's skill and judgment to select suitable Products.

55.     Defendant knew of Plaintiff's reliance on its skill and judgment in producing and selecting suitable products.

56.     The Products were not fit for the particular purpose of integration into the Solenoid and Steering Column as they were defective.

57.     Plaintiff timely notified Defendant of the defects and the recall.  In fact, Defendant assisted in the investigation of the defect in the Products.

11

58.     As a direct result of Defendant's breach of the implied warranty of fitness for a particular purpose, Plaintiff has been damaged and continues to be damaged in an amount to be determined at trial in excess of $1,500,000, plus all costs, attorneys' fees and other expenses/damages incurred.

WHEREFORE Plaintiff Capsonic Automotive, Inc. prays for the entry of a judgment in its favor and against Defendant Metal Kraft Industries, Inc. in an amount to be determined at trial believed to be in excess of $1,500,000.00, plus attorney's fees, costs of suit, and any other such further relief as this Honorable Court deems just and appropriate.

Respectfully submitted,

CAPSONIC AUTOMOTIVE, INC,
an Illinois corporation,

Dated: October 10, 2014          By:     /s/ Christopher S. Wunder
Christopher S. Wunder (cwunder@kpglaw.com)
Eric D. Kaplan (ekaplan@kpglaw.com)
KAPLAN PAPADAKIS & GOURNIS, P.C.
180 N. LaSalle Street
Suite 2108
Chicago, Illinois 60601
(312) 726-0531

12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CAPSONIC AUTOMOTIVE, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No:    14 CV 7933 |
| METAL KRAFT INDUSTRIES, INC., a Pennsylvania corporation, | ) ) ) | |
| Defendant. | ) | |

### DISCLOSURE STATEMENT PURSUANT TO RULE 7.1(a) AND LOCAL RULE 3.2(a)

Plaintiff Capsonic Automotive, Inc. ("Plaintiff"), by and through its counsel of record, pursuant to

Federal Rule of Civil Procedure 7.1(a) and Local Rule 3.2(a), hereby states as follows:

(1)     Plaintiff does not have a parent company; and

(2)     Plaintiff does not have any publicly held affiliates.

Respectfully submitted,

CAPSONIC AUTOMOTIVE, INC,
an Illinois corporation,

Dated: October 10, 2014            By:     /s/ Christopher S. Wunder
Christopher S. Wunder (cwunder@kpglaw.com)
Eric D. Kaplan (ekaplan@kpglaw.com)
KAPLAN PAPADAKIS & GOURNIS, P.C.
180 N. LaSalle Street
Suite 2108
Chicago, Illinois 60601
(312) 726-0531

13